## Case No. 11,462.

PULLAN v. CINCINNATI & C. AIR-LINE R. CO. et al

[5 Biss. 237.][1]

Circuit Court, D. Indiana. May Term, 1873.

EARNINGS OF RAILROAD COMPANY—BASIS OF COMPUTATION—WHEN COMPANY ESTOPPED BY NEGLECT—MORTGAGE MAY COVER FUTURE EARNINGS—EQUITABLE LIEN—WHEN MORTGAGOR CHARGEABLE AFTER ORDER TO SURRENDER—MASTER'S ESTIMATE—CONDUCT OF OBJECTOR—WHERE HIGHEST ESTIMATE ADOPTED—BURDEN ON OBJECTOR—RENT OF ROLLING STOCK—MORTGAGOR OF PART—WHERE WHOLE INTEREST MAY BE BOUND.

1. Where under a decree of foreclosure against a railroad company, reference had been made

1 [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

to a master to ascertain the gross earnings and expenses of a certain section of the road covered by a mortgage, it is not an erroneous principle for the master to make a pro rata estimate of the earnings and expenses of the whole road, it being shown before him that such section had not been operated separately, but as a part of the whole road, and no separate accounts kept of the income or expenses of any particular part. Though such a rule leads not to actual results, but to approximation merely, it is the best which could be adopted.

2. The railroad company cannot complain of the adoption of this rule where it was under a legal obligation to keep separate accounts of such section, and where it was by its own neglect that such separate accounts were not kept.

3. Notwithstanding the general rule that the mortgagor, until some action by the mortgagee, is entitled to the earnings and profits of the mortgaged property, it is competent for the parties to agree in the mortgage that such future earnings and profits shall be held in equity by the mortgagee, and under such a contract, such income whenever received is operated upon by the mortgage, and the party receiving it holds it in trust for whoever is in equity entitled to it.

4. Such a mortgagor remains chargeable with the income, even after he has offered it in open court to surrender the property to the mortgagee. The mortgage only took effect upon the income when earned, and as long as the mortgagor operated the road and earned income, he could not avoid his responsibility for it. The only valid answer would be either that he did not operate the road, or that there was no income earned.

5. Though an estimate by the master may not be entirely satisfactory to the court, if there is evidence which seems to justify him in his conclusions, and the party objecting did not furnish the master with evidence of any other state of facts, nor give him the proper assistance, the court will not usually interfere with the master's report on that ground.

6. Where under conflicting evidence the master had placed the highest estimated value upon property, the court will not set aside the master's report in this respect, unless there are circumstances in the case which show that the evidence fixing the lower value was more entitled to credit, and it is the duty of the party making the exception to satisfy the court that the report is wrong in this respect.

7. Eight per cent. is too low a rent for the use of rolling stock, where the owner bore all the loss and deterioration.

8. It seems, that although the mortgage only covered this one section, when a subsequent mortgagee in possession operated the whole road as an entirety, and had kept no separate account of that section, but mingled the earnings of the whole road, his whole interest in the road would be equitably bound for the amount of income.

9. Previous to the entering of final decree, any interlocutory decree is subject to examination and modification.

In equity. This was a bill of foreclosure filed by James Pullan, successor in trust to George Carlisle and Joseph B. Varnum, against the Cincinnati & Chicago Air-Line Railroad Company and numerous other parties in interest to foreclose a mortgage given February 25, 1852, in the form of a deed of trust, by the Newcastle & Richmond Railroad Company, to secure its bonds to the amount of $300,000. The present questions came up on exceptions to master's report.

Tilden & Osgood, Tilden & Shroder, J. E. Stevenson, and Wm. B. Pullan, for complainant.

The efficacy of the clause to convey future income will not be now questioned. Since Legard v. Hodges, 1 Ves. Jr. 477, no lawyer has doubted the correctness of the principle. From the nature of the case, the subject of the conveyance, i. e. the income, is not in esse at the time of the conveyance, so that at law it can not take effect; but in equity, it is treated as a valid contract, and takes effect as a present conveyance as soon and as fast as it comes into esse, and operates to transfer the absolute interest, or by way of trust, or to create a lien, according to the intention of the parties. 2 Story, Eq. Jur. § 1231; Abbott v. Goodwin, 20 Me. 408; Mitchell v. Winslow [Case No. 9,673]; Legard v. Hodges, 1 Ves. Jr. 477; Collyer v. Fallon, 1 Turn. & R. 459; Perry, Trusts, §§ 759, 761, 762.

1. It must be premised, as a matter of fact, that the Air-Line Company, the accounting defendant, has, pending this suit, transferred its rights, and that other corporate organizations have successively been interposed, and have received the income of which the complainant is in pursuit. But all were assignees and purchasers pendente lite, and will, of course, be bound by any decree which may be rendered in the case. Story, Eq. Pl. §§ 156, 351, and many decided cases.

2. The complainant would be authorized, if he thought proper, to resort to that remedy, and to file a supplemental bill against these pendente lite purchasers, and obtain against them a personal decree, and this remedy is distinctly affirmed in Minnesota Co. v. St. Paul Co., 2 Wall. [69 U. S.] 609.

3. But there is another remedy better adapted to the case, and which it is believed may properly be applied. The property of a corporation, of whatever it may consist, and whether the corporation is dissolved or in esse, or insolvent, is, in equity, a trust for the payment of its debts; and this trust raises a lien which will be enforced specifically, by proceedings in rem. No voluntary act of the corporation, done after it has ceased to act as such in the usual way, or of an insolvent corporation, will divest that lien. This is a familiar doctrine of equity, and abundantly sustained by the decisions of the American courts. Ang. & A. Corp. 477, and cases there referred to. As to the right of the mortgagee, out of possession, to demand an account of the income from the mortgaged premises, see Pardoe v. Price, 11 Mees. & W. 427, 13 Mees. & W. 267, and 16 Mees. & W. 451; Coe v. Beckwith, 31 Barb. 339; Howell v. Ripley, 10 Paige, 43; Thomas v. Brigstocke, 4 Russ. 64; Moore v. Titman, 44 Ill. 367.

The remedy to which the complainant is entitled: 1. The court may sequester the income of the mortgaged property, and direct it to be applied to the mortgage debt until paid. 2. The court may order a foreclosure of the equity of redemption, and a sale of the mortgaged property. In this case the court had the power to decree a sale of the corporate property and franchises. The instrument, although a trust deed in form, was simply a security for money loaned, and in fact, a mortgage. Coe v. Johnson, 18 Ind. 218; Coe v. McBrown, 22 Ind. 252; White Water Valley Co. v. Vallette, 21 How. [62 U. S.] 414. The fact that the mortgage was a railroad mortgage can make no difference with the general rules of law relating to mortgaged property. Dunham v. Cincinnati, etc., Ry. Co., 1 Wall. [68 U. S.] 254, 268. The complainant was, after default by the mortgagor, entitled to the possession of the section of the road mortgaged, and to the income thereof, but until he took such possession he was not in a position to ask for or demand an account of the rents and profits. 1 Hil. Mortg. 198; Fitchburg Cotton Manuf'g Co. v. Melvin, 15 Mass. 268; Wilder v. Houghton, 1 Pick. 87; Higgins v. York Bldg. Co., 2 Atk. 107; Astor v. Turner, 11 Paige, 436; Howell v. Ripley, 10 Paige, 43; 1 Washb. Real Prop. 532.

E. Walker, J. E. McDonald, and A. L. Roach. for defendants, filed an elaborate brief citing the following authorities:

In general, the rents and profits of mortgaged premises belong to the mortgagee or his assignee, until a foreclosure and sale. Bank of Ogdensburgh v. Arnold, 5 Paige, 38. And if the real property is insufficient to pay the debt, and the mortgagor is insolvent, the mortgagee can only reach the rents and profits by a proceeding for that purpose, or by a decree and sale of the real estate. Id. If a mortgagee takes possession before foreclosure, he is required to account for the rents and profits. Van Buren v. Olmstead, 5 Paige, 9. The mortgaged premises are in general regarded as the primary fund for the payment of the debt. Tice v. Annin, 2 Johns. Ch. 125; McKinstry v. Curtis, 10 Paige, 503. Rents and profits actually received by a mortgagor rightfully in possession, before an order of sequestration is made, cannot be recovered of him, and so of an equitable incumbrancer. 1 Washb. Real Prop. 532; Clarke v. Curtis, 1 Grat. 289; Coote, Mortg. 325. Mr. Washburn also says: "The mortgagor cannot be charged with the rents of the premises before the mortgagee shall have obtained actual possession, even though the premises are an adequate security for the debt, and this extends to the grantee of the mortgagor, and includes rents accruing after the commencement of process to obtain possession. 1 Washb. Real Prop. 549; Coote, Mortg. 325; Gibson v. Farley, 16 Mass. 280; Boston Bank v. Reed, 8 Pick. 459; Hughes v. Edwards, 9 Wheat. [22 U. S.] 489; Bank of Ogdensburgh v. Arnold, 5 Paige, 38; Grable v. McCulloh, 27 Ind. 472; Edw. Rec. 360.

DRUMMOND, Circuit Judge. In 1848, the legislature of this state authorized the con-

struction of a railroad from Richmond to Newcastle, a distance of twenty-seven miles.

The act was amended in 1851, by authorizing the extension of the railroad in a northwestern direction to a point on the Wabash river, opposite Logansport, and in that way to Lafayette.

The act of the legislature amending the original charter, required that the accounts connected with the running and construction of the road should be kept distinct, and that when the road was completed it should all be united and constitute one entire railway. In 1852, the road having occasion to borrow some money, executed a mortgage or deed of trust to trustees, of whom Mr. Pullan, the plaintiff, is the successor, to secure three hundred thousand dollars of bonds which were issued and transferred to various parties, who advanced money upon them.

This mortgage described the property as "the present and future-to-be-acquired property of the Newcastle and Richmond Railroad Company, that is to say, the first section from Richmond to Newcastle."

A bill was filed in November, 1864, to foreclose this mortgage,—neither principal nor interest having been paid,—and it is for relief under this bill of foreclosure, and for payment of principal and interest of these bonds, that the case has been so long pending in court, and is now about to be finally disposed of.

The Cincinnati & Chicago Air-Line Railroad Company was made a defendant at the time this bill was filed.

Between the date of the mortgage in 1852, and the filing of the bill, there had been other mortgages executed upon the whole property between Logansport and Richmond, and under a foreclosure of one of these mortgages in this court the property was sold subject to the mortgage of 1852. The various parties went into possession, and under this decree and sale the Cincinnati & Chicago Air-Line Railroad Company was holding the property at the time this bill was filed. They, of course, were not bound to pay the three hundred thousand dollars, the debt for which the mortgage of 1852 was given. They had nothing to do with the contract made between the road and these parties (holders of these bonds) other than that they were in possession of the property which was given to secure the payment of these bonds and interest.

I think this is all that it is necessary to state before coming to what took place in this court at the May term, 1869, under the bill filed in this cause in 1864. Much had occurred during the progress of the case; many orders had been made by the court; and among others, orders requiring separate accounts to be kept and money to be paid into court for the purpose of protecting these mortgages, which orders do not seem to have been in all respects complied with.

At the May term, 1869, Davis, J., made an interlocutory decree, which is the foundation of all the questions which arise before me at this time. That decree found that the mortgage of 1852 covered the railroad and its revenues between Richmond and Newcastle, and that the road between these two points, "with the bridges, depots, and other property thereon, with the tolls and income arising therefrom," were within the terms of the mortgage. And the court found negatively that the mortgage did not extend to any other portion of the road, nor were the income and tolls of any other part of the road mortgaged. It found also, as a necessary corollary from this, that the plaintiff was entitled to receive from the defendant nothing more than the net income of the road from Newcastle to Richmond. It also found that the rolling stock which the defendant had purchased from Chouteau and others who claimed under the decree and sale under a subsequent mortgage, was in fact equitably owned by the old road, and should be divided ratably between the parties—that it to say, as twenty-seven, the distance between Richmond and Newcastle, is to one hundred and eight, the distance between Richmond and Logansport, or one-fourth of the rolling stock,—and that for one-fourth of the value of the rolling stock at the date of its conversion by the defendant, with interest, the defendant was liable.

The first question arises upon this decree.

The case was referred to a master and instructions given to him as to his report and the principles which should govern his calculation. He has made his report, exceptions have been filed and argued, but the plaintiff has claimed the right to question one of the points found by the court in its interlocutory order of May, 1869, and it is the undoubted right of the plaintiff so to do. Until the case is finally disposed of by the chancellor, any interlocutory order made during the progress of the case is subject to modification.

This order made in May, 1869, was only an interlocutory order and it is therefore within the rule. It is claimed on the part of the plaintiff that the order made at that time by the court, declaring that the mortgage only covered that portion of the railroad between Richmond and Newcastle, was erroneous, for the reason that the statute amending the charter and authorizing the extension of the road to Logansport obviously contemplated that there was to be one entire road; that separate accounts were to be kept, and that when it was completed, the road was a whole, and was not therefore separable into distinct parts, and that ipso facto (and not by anything which took place afterwards and by which income was earned by the assignees or vendees under a decree of this court) by the passage of the amendments and the directions of the legislature and the taking possession and completion of the road to Logansport, the mortgage expanded and brought within its grasp the whole road from New-

castle to Logansport as well as that from Richmond to Newcastle.

An argument has been submitted on that point, the strength of which the court feels and admits. But it would have to be a very clear case—one about which no doubt could be entertained—to warrant the court in the present aspect of the case in interfering with the order made at the May term, 1869.

If the case is doubtful it is not the duty of the court to modify or change that part of the decree, and on looking at it, I am not satisfied, notwithstanding the arguments which have been used, that that portion of the decree is erroneous, and I do not feel at liberty to interfere with it, but think that it ought to stand as the decree of the court and as binding upon the court now. So that we must proceed on the assumption that the mortgage, or deed of trust, only covers so much of the property as was described by the interlocutory order of the May term, 1869, and consequently we must deny the right of the plaintiff to bring the whole road, that is the one hundred and eight miles, under the mortgage. This is entirely independent of any question which arises in consequence of the defendants receiving income from the road, which depends upon different principles.

There are some principles involved in the master's report which are questioned, and as to which it is the duty of this court to give its opinion. The master, it seems, being instructed by the interlocutory order already referred to, to ascertain the gross earnings of this part of the road from the time the bill was filed, and from its earnings to deduct the expenses, not allowing for permanent improvements which were not required to run the road safely and securely, and being instructed also that a reasonable rent should be allowed for the use of the rolling stock employed in making gross earnings, made a pro rata estimate of the earnings and of the expenses of the road in order to reach the results required by the court, viz. the net earnings of the road between Richmond and Newcastle. The objection is made that that principle was erroneous. I am satisfied that it was, under the circumstances, correct, and that no other course could be adopted. I admit that it is a very unsatisfactory mode—that it does not necessarily lead to a true result, but I think it is the only practicable mode by which the master could reach the result aimed at by the court. The reasons for the rule which the master adopted are, I think, satisfactorily stated by him in his report. He says that from the organization of the Newcastle & Richmond Railroad Company, and through all the changes and consolidations, which were numerous, the road from Richmond to Newcastle has been operated and used, and is now operated and used, and the income received, and the operating expenses paid as a part of the entire road; that no accounts were made or kept showing separately the income or operating expenses

of any particular part, and that the income of this part has been blended with the income of all the other parts of the several lines of road of which it formed a portion, and that the operating expenses have in like manner been paid out of the common fund produced by the use of the various parts. Now, under such circumstances, it is difficult to see how the master could adopt any other rule than he has adopted, admitting that this rule leads not to actual results, but to an approximation merely.

Its soundness will be further illustrated by the legislation connected with this railroad. It was obviously intended that the accounts should be kept separate until the road was finally completed to Logansport, so that it should be known precisely how much each part cost, both in construction and in operation. This was a law that stood directly in the path of all these parties, individual and corporate, who were in possession or who came into possession of this railroad. It was a rule for their conduct which was disregarded by them, and I do not think that it is competent for them to complain if the pro rata estimate is now adopted for the purpose of ascertaining the net income of the road between Richmond and Newcastle. It is something that grows out of their own fault, with which the mortgagees under the mortgage of 1852 had nothing to do, and for which they can not justly be held responsible. This disposes of the first, second, third, fourth and eighth exceptions that have been taken to the master's report, and they are overruled, because they all proceed upon the ground that the master erred in adopting that rule for the purpose of ascertaining the net earnings of the road between Richmond and Newcastle.

Another objection is, that the earnings of the road should be taken into account from the time that the Cincinnati and Chicago Air-Line Railroad Company went into possession of the road, July 1, 1860.

The interlocutory order of May, 1869, declared that the plaintiff was entitled to the net income of the road for the twenty-seven miles, from the date of the filing the bill, namely, from November, 1864. It does not appear why that time was fixed on by the court. It may have been on the ground that the court would hold a party in possession for the net income of the road from the time that it should be considered a demand was made for the earnings and income. However that may be, the court at the May term, 1872, modified the order which was originally given to the master, and authorized him to take an account of the earnings of the road from the 1st of July, 1860, leaving the parties to the equities which might arise in reference to that modification of the order, it obviously being the intention of the court to leave the question open for the decision of the court at this time; and that, therefore, is the question which now arises: What is the true con-

struction of the language in the mortgage: "The present and future-to-be-acquired property of the Newcastle and Richmond Railroad Company; that is to say, the first section from Richmond to Newcastle."

The property and the future-to-be-acquired property, and income of the road were mortgaged. I think that the mortgagees were entitled to the income of the road as soon as it came into existence as property.

This question is quite important, because I believe the net earnings, between the time the defendant took possession, on the first of July, 1860, up to the time of the beginning of the suit, as found by the master, amount to ninety-five thousand three hundred and forty-four dollars and eight cents ($95,344.08). It is in relation to the principle which we are now considering that the fifth exception by the defendant is made to the master's report.

It is claimed that the general rule is—and there is no controverting the position in case of an ordinary mortgage—that the mortgagor, until he is interfered with by the mortgagee, has the right to the earnings and the profits of the mortgaged property; that any income derived from it becomes the property of the mortgagor; that in point of fact, the mortgagor cannot mortgage, and does not mortgage, what is not in esse at the time he executes his mortgage.

The rents, profits and income, is something that arises in the future. It is claimed that it is not possible for the mortgage to cover what is only to be brought into existence after its execution. There is no disputing this general rule. But the question is whether parties cannot agree that as soon as property does come into existence in the future, that property shall be seized by virtue of the contract and held in equity for the fulfillment of the obligation of the mortgagor, and I think it can be, and that when the income of this property came into being, that is to say, as soon as it was received, then the mortgage operated upon it by virtue of the contract which was made between the parties; and whoever received the income, received it and held it in trust for the party who was entitled to it. I do not see how this differs from the principle declared by the supreme court of the United States, in the case of Coe v. Pennock, 23 How. [64 U. S.] 117. The question there was whether property which was acquired after the mortgage was executed, became the property of the mortgagees as against subsequent creditors, and the court held that it did. That was a case where locomotives and cars were constructed and put on the road after the date of the mortgage, and it seems to me that the principle operates in this case with peculiar force, because these parties took possession of this property with the knowledge of the contract which was in existence.

It was on the face of the decree under which they claimed. They could no more get rid of it, or of its binding effect in equity, than they could of any other fact set forth in the title under which they held.

The decree of this court was the foundation of their title and is to-day the only one, as far as this court knows, upon which that title depends, and that declares they took the property subject to this mortgage. Then I hold that the parties who have knowledge of this—and they must be presumed to have—as soon as they received the income of this property, held it for the benefit of those who were protected by the mortgage of 1852. And these circumstances furnish an additional reason why it was obligatory upon them thus to discriminate, so as to know what the expenses and earnings were upon this particular section of the road. But it is said by the defense that however this may be, the defendant certainly would not be chargeable with any income after it offered to deliver up, in open court, and surrender to the plaintiff the property of which it was in possession, and the only property, as it insists, that was covered by the mortgage. The answer to this is, that as to the income there was no mortgage upon it, and no trust unless it was earned. If they operated the road and earned income, they could not, of course, avoid the responsibility growing out of these facts. The only answer that they could have made would be that there was no income earned, or that they did not use the road.

It is objected that the percentage of expenses of the gross earnings of the road, as established by the master in his report, is too small; that was fixed at sixty-three and three-tenths per cent., and it is in relation to this that the court has had the most difficulty.

I have an impression, I may as well state frankly, that this percentage is not large enough; but I have examined very carefully the report of the master, and the reasons he gives for fixing upon this percentage, and I cannot say that the proof does not warrant it. It is claimed that the master took the gross earnings of the road from the books of the defendant, but did not take the expenses from the same source; and it is insisted, and with some considerable plausibility, that having gone to one source of information for the earnings, and the same source furnishing the expenses, that he should not have taken the account of earnings without also having taken that of expenses.

But he says that in the expenses there were included other items than the mere running expenses of the road, which he thought it was his duty alone to consider; that the construction account included in it various other things, all of which went to make up the sum total of the expense account, and as to which he could not discriminate.

I may add that in some instances it is stated by the master that at a particular time, which he gives, the expenses of the road were, in one case, over ninety per cent., and in another, eighty-two per cent., and it is

claimed that he ought to have taken this during that time to determine the running expenses; but he has given the reason why it was not done, and while I am not entirely satisfied that this percentage is large enough, still I do not see anything in the case that warrants the court in interfering with the report of the master on that ground. I can not say but what there is evidence in the case that may justify him in his conclusions; and I think, perhaps, there may be some complaint made that all the light that could be thrown on this subject was not furnished by the defendant, but that the master was left to grope in the labyrinth of accounts, without the assistance which might have been rendered. I do not know that this is actually true, but there is something that seems to indicate it.

Observations of a somewhat similar character may be made to the objection taken to the account furnished by the master as to the value of the rolling stock which was turned over to the defendant at the time it took possession under Choteau and others.

The master states the circumstances connected with this part of his report. He says that the testimony as to their value was conflicting, and that he was obliged to form an opinion somewhat from the value of such articles, as established by the market generally. The discrepancy between the statements of Judson and Gest, if they may be considered binding as testimony upon the master, is very great, as to the value of this property—one of them making it only $48,260 and the other $100,000. The master says that in view of all the circumstances, he finds that a reasonable price would be $100,000, and thinks it would be rather less than the actual value. Now the question is whether the court can interfere with the report of the master on the ground that he has committed an error as to the value of this rolling stock. It was competent for the master to believe one of these witnesses rather than the other, and unless there are some circumstances in the case that show the one fixing the lesser value was more entitled to credit than the other, the court cannot interfere with the report of the master on that ground. It is the duty of the party making the exception to satisfy the court that the report is wrong in this particular; otherwise it must stand.

There is one point upon which the court differs from the master, and the exception will be sustained; and that is, as to the rule by which the master determined the amount of rent to be paid to the parties who owned the rolling stock which ran over this road, and by means of which the income was obtained. The interlocutory order of May, 1869, instructed the master that a reasonable rent should be allowed for the use of this rolling stock, and the master has fixed the rent at eight per cent., and finds that sum was a reasonable rent for the use of the rolling stock employed in making the earnings over twenty-seven miles of the road.

The question is whether, all things considered, that is a sound rule. I hardly think it is. It is right that the master should be heard in explanation of his finding upon this point, and he says that the rolling stock employed was maintained and kept in repair by expending money and labor, treated and charged as part of the operating expenses of the road, and therefore in fixing the amount of rent he did not take into consideration the wear and tear, but the value of the rolling stock as forming so much capital invested and employed in making the earnings, and he has apportioned the value according to the length of the road; and, upon the capital thus ascertained he has calculated it at eight per cent. as a reasonable rent. Now I think the circumstances of the case do not warrant that. It seems to me that that is too low a per cent. for the use of the rolling stock of the defendants. This was an important element in the earnings of the road, and it seems to me that the master has hardly had a just appreciation of the part this rolling stock bore in obtaining these earnings. Eight per cent. on that kind of property, considering how subject it is to loss and deterioration in many ways, seems hardly enough, and I think that the facts scarcely warranted the master in finding so low a percentage; and that exception will be sustained by the court.

Some criticism has been made upon the manner in which the master obtained the results upon his pro rata rule. It is insisted on the part of the defense that he has made his denominators too low in every instance. For example, the master took the length of the road from Richmond to Logansport, one hundred and eight miles, to obtain a pro rata estimate for twenty-seven miles, then he took the length of the road from Richmond to Valparaiso, 170 miles, to make a pro rata estimate, and then for Chicago 216 miles, and then for the whole length of the road, about 580 miles. I am rather inclined to think there is something in this criticism on the part of the defense; and therefore in referring back the case to the master, I shall ask him to reconsider his pro rata estimate upon these points and see whether he has been precisely correct. I am not certain as to this, and therefore I shall not make an absolute ruling upon that point.

There is only one remaining question which, although it is not absolutely necessary now to discuss or decide, still as it was presented in the argument, and may have some influence upon the action of the parties, I may as well state what is the opinion of the court. That is as to the effect of any finding of the court against the defendant for the indebtedness which is due for the income upon its property, I mean the Cincinnati & Chicago Air-Line Railroad Company. It is claimed that although the mortgage may not cover

any other property than that between Richmond and Newcastle, as it included the income and after-acquired property of the road, and the defendant was in possession, subject to the equities protected by the mortgage, that its property is bound equitably for any decree that may be rendered against it. And I do not know why this principle, to some extent at least, may not be a sound one. They, as the operators of the road from Richmond to Logansport, received the income on this particular part; as receivers of the income of this part they may be bound to respond for that to the mortgagees under the mortgage of 1852.

As the court has already said, they held it in trust for whomsoever are entitled to it, and having so received and held it, there may be, perhaps, an equitable lien upon their property to respond for the amount. But I do not decide this point, and it may remain open for future consideration.

I may say, in conclusion, that the master appears to have devoted himself with great industry and fidelity to the investigation of the several points submitted to him by the court, and the manner in which he has discharged his duty, considering the many difficulties and embarrassments attending its performance, is very creditable to him. And the court, in the examination of the various questions referred to in this opinion, has derived great assistance from the arguments of the counsel on both sides.

NOTE. For other opinions in this case, see Bill v. New Albany, etc., Ry. Co. [Case No. 1,407]; Pullan v. Cincinnati & C. Air-Line R. Co. [Id. 11,461].

That a court may on, or previous to, the final judgment revise any of its preliminary orders, consult Breedlove v. Nicolet, 7 Pet. [32 U. S.] 413; Simson v. Hart, 14 Johns. 63; Akerly v. Vilas [Case No. 119].